GLENDA ELLINGTON, Special Adm'x of the Estate of Darlene F. Riddle, Deceased, Plaintiff-Appellant, v. YILMAZ BILSEL, Defendant-Appellee.

Fifth District   No. 5—92—0124

Opinion filed December 30, 1993.

Michael J. Reagan and J. Michael Weilmuenster, both of Kassly, Bone, Becker, Dix, Reagan & Young, P.C., of Belleville, and William S. Daniel, of Daniel Law Offices, of Collinsville, for appellant.

Jonathan Ries and Jan E. Dodd, both of Sandberg, Phoenix & von Gontard, P.C., of St. Louis, Missouri, for appellee.

JUSTICE WELCH delivered the opinion of the court:

On December 29, 1988, Glenda Ellington (plaintiff), as special administratrix of the estate of Darlene Riddle (decedent), filed suit against Doctor Yilmaz Bilsel (defendant) in the circuit court of St. Clair County pursuant to the Wrongful Death and Survival Acts (Ill. Rev. Stat. 1991, ch. 70, par. 0.01 *et seq.*; Ill. Rev. Stat. 1991, ch. 110½, par. 27—6), alleging that the death of the decedent was the result of medical malpractice. Specifically, the plaintiff alleged that the defendant's prescription of Zarontin and Dilantin (antiseizure medications), either separately or in combination, resulted in the decedent's development of aplastic anemia (a blood disease), which caused the decedent's untimely death at the age of 22.

Trial commenced on October 21, 1991, and proceeded through October 29, 1991. The plaintiff called eight witnesses: (1) Dr. Jonathan Borak (an internist, assistant professor of medicine, and medical expert witness from New Haven, Connecticut); (2) Stephen Frost (decedent's brother); (3) Julie Frost (decedent's sister); (4) Glenda Ellington (decedent's mother); (5) Yilmaz Bilsel (defendant); (6) Dr. Ronald Welch (a neurologist); (7) Dr. Leroy Grossman (an economics professor and expert witness); and (8) Dr. Shabir Safdar (a hematologist who treated the decedent). The defendant called three witnesses: (1) Brenda McManame (defendant's medical assistant and secretary from 1981-84); (2) Yilmaz Bilsel; and (3) Simon Horenstein

(a neurologist, professor, and expert medical witness). Counsel for both parties conducted extensive examination of the witnesses.

Briefly stated, the following evidence was adduced at trial. In 1978, the defendant began treating the decedent for, *inter alia*, a preexisting seizure disorder. In October 1982, the defendant prescribed Zarontin for the decedent. In November 1982, the defendant prescribed Dilantin for the decedent. On June 5, 1983, the decedent was admitted to St. Elizabeth Hospital in Belleville by a Dr. Kahlid. Following unsuccessful treatment, the decedent died on December 21, 1983, as a result of her aplastic anemia. There were essentially two pivotal and highly contested issues at trial: (1) whether there existed a physician-patient relationship between the defendant and the decedent and (2) whether the decedent's aplastic anemia was caused by Zarontin and Dilantin or whether it was idiopathic (having no known cause). The case went to the jury on October 29, 1991. Later that day, the jury returned a verdict against the plaintiff and in favor of the defendant. On October 30, 1991, the circuit court entered judgment on the verdict.

On November 26, 1991, the plaintiff filed a post-trial motion asking the court to grant a new trial. On November 27, 1991, the plaintiff filed an amendment to her post-trial motion. On January 24, 1992, the court denied the motion. The plaintiff now appeals and raises the following three issues: (1) whether defense counsel's closing argument deprived the plaintiff of a fair trial; (2) whether the defendant violated the Dead Man's Act (Ill. Rev. Stat. 1991, ch. 110, par. 8—201 (now 735 ILCS 5/8—201 (West 1992))) such that the plaintiff was denied a fair trial; and (3) whether the jury was properly instructed. We answer the first two issues in the negative and the third in the affirmative. Consequently, the circuit court is affirmed in all respects.

The first issue concerns statements made by defense counsel during closing argument. The plaintiff contends that defense counsel's references to Dr. Borak (plaintiff's expert medical witness) as being "polished" and a "performer" were improper, inflammatory, and prejudicial and denied her a fair trial. In closing argument, defense counsel stated the following:

> "And what did [Dr. Safdar] tell us? He said the subject of where a patient and a doctor's responsibility in this relationship starts and ends is something that has been debated for a long time in medical circles, that it's not something that can be decided one way or the other in a situation like this, and that he is not prepared to say that Dr. Bilsel violated it. Who

does say it? Dr. Borak says it. Yes, Dr. Borak. He says that—and he's a very *polished* witness. He dresses very well. He presents himself very well. He speaks—he's art—speaks very well, very articulate. He's obviously a very bright, intelligent man. No wonder that the Intercity Consulting Company sends him out around the country to talk to juries in cases.

You know you need to ask yourself something about a witness that's that *polished* that comes to you from New Haven, Connecticut like why? What special qualifications does a witness like that bring to the issues under consideration before you? Is it necessary to go all the way to New Haven, Connecticut for a witness or a *performer* on the subject of treating seizures and then come back to Belleville with a witness who's *polished* but doesn't treat seizures? Who doesn't treat aplastic anemia? Who's never used Zarontin? Just practices. Not involved doing the very thing that he says Dr. Bilsel did wrong, or do we finally get some idea of what Intercity Consulting Corporation means when it sends people around." (Emphasis added.)

The plaintiff further argues that defense counsel's reference to a nonexistent handwriting expert during closing argument was intentionally misleading, inflammatory, and prejudicial, and resulted in an unfair trial. Defense counsel stated the following in closing argument:

"Dr. Bilsel was shown *** a whole series of handwritten prescriptions. Only one that was his that's been shown to him in this case was the one he identified, the one we showed you, and plaintiff asked Dr. Bilsel some questions about those pads. He said, 'That's your writing? Is that your signature?' Dr. Bilsel said no to all that. So the plaintiff's lawyer must have been challenging him about those things. Well, Dr. Bilsel's always denied it. They knew he was denying it. *Did you see their handwriting expert?*

\* \* \*

I heard something in this argument here today about Dr. Popovic and Dr. Kahlid. Well, you've seen a performance from a lawyer that's not overlooking anything, ladies and gentlemen, and you're entitled to understand that if the plaintiff thought that Dr. Popovic or Dr. Kahlid would have something critical of Dr. Bilsel or help him prove what he needed to prove, do you think they would have left him out of the case? *Or the handwriting expert* or the people from

the pharmacy? No, they didn't call them either." (Emphasis added.)

We begin by noting that wide latitude must be afforded counsel in closing argument. (*Moore v. Centreville Township Hospital* (1993), 246 Ill. App. 3d 579, 590, 616 N.E.2d 1321, 1329; *Lewis v. Cotton Belt Route—St. Louis Southwestern Ry. Co.* (1991), 217 Ill. App. 3d 94, 119, 576 N.E.2d 918, 937.) We further note that plaintiff failed to make contemporaneous objections to defense counsel's comments during trial. Plaintiff first objected to the comments in a post-trial motion. "A party cannot sit on his hands and let perceived errors into the record and complain of those errors for the first time in a post-trial motion." (*Pharr v. Chicago Transit Authority* (1991), 220 Ill. App. 3d 509, 515, 581 N.E.2d 162, 166.) Failure to make a timely objection at trial to alleged errors in an opponent's closing argument is considered a waiver of the objection. (*Bruske v. Arnold* (1969), 44 Ill. 2d 132, 137, 254 N.E.2d 453, 456; *McElroy v. Force* (1967), 38 Ill. 2d 528, 535, 232 N.E.2d 708, 712; *Pharr*, 220 Ill. App. 3d at 515, 581 N.E.2d at 166.) The waiver rule is based upon the obvious need to conserve judicial resources and reduce litigation costs. A timely objection allows the trial court to remedy the potential effect of an allegedly prejudicial statement by giving a curative instruction. Thus, by dealing with the situation at trial, judicial resources are not wasted on retrials and the parties are not made to bear the costs incident to retrying a case.

However, the plaintiff argues that she comes within the plain error exception to the waiver rule. Under this exception, if unobjected-to remarks are so improper, inflammatory, and prejudicial that a litigant is deprived of a fair trial *and* the judicial process cannot stand without deterioration, a reviewing court may nonetheless consider such assignments of error although no objections were made at trial. See *City of Quincy v. V.E. Best Plumbing & Heating Supply Co.* (1959), 17 Ill. 2d 570, 577, 162 N.E.2d 373, 378; *Belfield v. Coop* (1956), 8 Ill. 2d 293, 313, 134 N.E.2d 249, 259; *Lewis*, 217 Ill. App. 3d at 119, 576 N.E.2d at 937.

It is well established that "the determination of whether argument not objected to was so pervasive as to deny a party a fair trial is a matter of sound trial court discretion, and that determination will not be disturbed on appeal absent a 'clear abuse of that discretion.'" (*Stambaugh v. International Harvester Co.* (1982), 106 Ill. App. 3d 1, 22, 435 N.E.2d 729, 745, *rev'd on other grounds* (1984), 102 Ill. 2d 250, 464 N.E.2d 1011; see also *Lewis*, 217 Ill. App. 3d at 119, 576 N.E.2d at 937; *Carlasare v. Wilhelmi* (1985),

134 Ill. App. 3d 1, 7, 479 N.E.2d 1073, 1077; *Greig v. Griffel* (1977), 49 Ill. App. 3d 829, 844, 364 N.E.2d 660, 671.) A reviewing court gives "considerable deference" to the trial court in determining whether a party was denied a fair trial due to improper closing argument because the trial court, having heard all of the comments and arguments, is in a superior position to assess the accuracy and prejudicial effect, if any, upon the jury of counsel's statements. *Moore*, 246 Ill. App. 3d at 590, 616 N.E.2d at 1329; *Greig*, 49 Ill. App. 3d at 844, 364 N.E.2d at 671.

With the forgoing in mind, we now address the substance of plaintiff's contentions. As to the characterizations of Dr. Borak being "polished" and a "performer," the plaintiff relies on the "hired gun argument" line of cases in arguing that defense counsel's remarks were prejudicial and resulted in an unfair trial. *Regan v. Vizza* (1978), 65 Ill. App. 3d 50, 53, 382 N.E.2d 409 (denial of plaintiff's post-trial motion for a new trial reversed because defense counsel stated in closing argument that: (1) the jury could "draw a similarity with [plaintiff's expert medical witness] and a hired gun in the old West"; and (2) the jury might recall "a T.V. program with a guy named Paladin whose card read, 'Have Gun Will Travel' " and "[plaintiff's medical expert] is 'Have medical testimony will travel' "); *Cecil v. Gibson* (1976), 37 Ill. App. 3d 710, 711, 346 N.E.2d 448 (judgment for defendant reversed because defense counsel stated during closing argument that: (1) plaintiffs' attorney was a "slick attorney from Chicago" and a "slick hired-hand"; (2) plaintiffs' expert medical witness was a "sidekick" and a "righthand man"; (3) plaintiffs' counsel "manufactured" evidence, had a "wild imagination," was not worthy of the jury's trust, and was the "captain of [the] ship" who was "piloting" the testimony of his expert medical witness; (4) the relationship between plaintiffs' counsel and his expert medical witness was comparable to that existing between the "Cisco Kid and Poncho" and "Matt Dillon and Chester"; and (5) plaintiffs' expert medical witness was a "professional witness" whose "shiny black leather bag" contains instruments that "have never been used").

Unlike the court in *Cecil*, which found that "defense counsel's final argument clearly exceeded all bounds" (*Cecil*, 37 Ill. App. 3d at 712, 346 N.E.2d at 449), we do not believe that defense counsel's references to Dr. Borak "exceeded all bounds." The plaintiff's reliance on *Cecil* and *Regan* in arguing that "defense counsel's verbal attacks on Dr. Jonathan Borak were similarly inflammatory" is baseless. It cannot be seriously maintained that defense counsel's

references to Dr. Borak as "polished" and a "performer" rise to the same level as the torrent of inflammatory statements made by counsel in the *Cecil* case. Even if defense counsel had made the "hired gun" type of argument condemned in *Cecil* and *Regan*, this court's recent decision in *Moore v. Centreville Township Hospital* (1993), 246 Ill. App. 3d 579, 616 N.E.2d 1321, would not require reversal. In *Moore*, this court per Justice Chapman rejected *Cecil* and other cases that had held the "hired gun" argument to be improper. (See *Moore*, 246 Ill. App. 3d at 592-94, 616 N.E.2d at 1330-32.) Lastly, we agree with the trial judge, who, after fully considering the arguments of counsel at the post-trial motion hearing, concluded that defense counsel's use of "polished" and "performer" were "reasonable comments upon Dr. Borak and reasonable comments upon his appearance in the trial." As a result, we find no abuse of discretion on the part of the circuit court in denying the plaintiff's motion for a new trial based upon defense counsel's use of the terms "polished" and "performer" in reference to Dr. Borak.

■ Next, plaintiff argues that defense counsel's statements concerning the nonexistent handwriting expert were so improper, prejudicial, and inflammatory that she was denied a fair trial. Plaintiff further asserts that the trial court abused its discretion in denying her motion for a new trial. We disagree. As outlined earlier in this opinion, whether a party was denied a fair trial due to improper closing argument is a matter of sound trial court discretion (*Lewis*, 217 Ill. App. 3d at 119, 576 N.E.2d at 937); a reviewing court gives "considerable deference" to that determination (*Moore*, 246 Ill. App. 3d at 590, 616 N.E.2d at 1329); and we will reverse only where there is a clear abuse of discretion (*Lewis*, 217 Ill. App. 3d at 119, 576 N.E.2d at 937).

In his closing argument, plaintiff's counsel responded to the comments about the handwriting expert by stating:

> "I was challenged why didn't I have a handwriting expert for those prescriptions. And that really puzzles me because you'll remember most of them were telephone prescriptions, and what good would a handwriting expert do for a telephone prescription where the pharmacist over the phone writes down what the doctor says. Handwriting expert won't do me any good."

Based on this, the trial court concluded, and we agree, that plaintiff's counsel, as an experienced trial attorney, chose not to object to the comments about the handwriting expert for tactical purposes:

"The Court is satisfied, though, that [plaintiff's attorney] certainly handled this matter well in closing argument, and if there was any prejudice to the plaintiff by [defense counsel's] comments, [plaintiff's attorney] certainly handled that in his portion of the closing argument, and as far as this Court is concerned in the absence of an objection to this, *the Court can only conclude that [plaintiff's attorney] utilized an opportunity or strategical purpose* and is an experienced trial lawyer, and the Court's not going to jump in there and undo things because—and the Court can't as far as this Court is concerned unless it rises to the level of plain error, and those comments with regard to the handwriting expert do not rise to plain error [in this case]." (Emphasis added.)

As the appellate court stated in *Stambaugh v. International Harvester Co.* (1982), 106 Ill. App. 3d 1, 22-23, 435 N.E.2d 729, 745:

"We are persuaded, as was the trial court, that defendant was represented by experienced counsel who obviously and consciously chose not to object as a matter of trial strategy. To allow this deliberate and knowledgeable silence now to be used as a basis for reversing the verdict in this trial would *** constitute a deterioration of the judicial process. The trial court could early have stopped the improper comments upon defendant's objection and admonished the jury of the impropriety ***. Defendant may not now use this silence to its advantage when it failed to act earlier when given an opportunity *** to do so."

After a careful review of the record in the instant case, we do not believe that defense counsel's unobjected-to comments were so prejudicial as to deny the plaintiff a fair trial. Nor do we believe that the trial court abused its discretion in denying plaintiff's motion for a new trial.

The plaintiff also argues that the trial court abused its discretion in denying her motion for a mistrial and motion for a new trial based upon five alleged violations of the Dead Man's Act (Ill. Rev. Stat. 1991, ch. 110, par. 8—201 (now 735 ILCS 5/8—201 (West 1992))). In relevant part, the Dead Man's Act provides:

"In the trial of any action in which any party sues or defends as the representative of a deceased person ***, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased *** or to any event which took

place in the presence of the deceased ***." Ill. Rev. Stat. 1991, ch. 110, par. 8—201 (now 735 ILCS 5/8—201 (West 1992)).

The purported purpose of the Dead Man's Act is "to remove the temptation of the survivor to a transaction to testify falsely and to equalize the positions of the parties in regard to the giving of testimony." (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §606.1, at 314 (5th ed. 1990).) The plaintiff maintains that the defendant violated the Dead Man's Act three times and that defense counsel violated the Act twice during closing argument. The defendant's first alleged violation occurred as follows:

"Q. [Plaintiff's counsel] You didn't call her; did you, Doctor?

A. She did not call. She did not come.

Q. All right. And you didn't call her either, did you?

A. I don't recall.

Q. All right.

A. She must be—*she was given orders.* She has to—she must keep appointment. Otherwise she has to call the office, cancel appointment." (Emphasis added.)

The defendant's second alleged violation occurred as follows:

"Q. [Plaintiff's counsel] No, sir. My concern is this, patients don't always come every six months to see a physician or every three months?

A. This was—*she was instructed* she must come every month—

[Objection by plaintiff's counsel] Excuse me, your honor, this violates the Deadman's Act. I move to strike the testimony and instruct the witness that it's improper." (Emphasis added.)

The defendant's third alleged violation occurred as follows:

"Q. [Plaintiff's counsel] And another warning about this drug to look for would be rashes under the PDR; is that correct?

A. Yes.

Q. A rash.

A. When I start medication *I talk to her about this*—

[Objection by plaintiff's counsel] Your Honor, excuse me, this is clearly in violation of the Court's Order." (Emphasis added.)

Defense counsel's first alleged violation of the Dead Man's Act occurred during closing argument when he told the jury they could anticipate a Dead Man's Act jury instruction:

"Now, you may have wondered at some time during this case why Dr. Bilsel wasn't asked and why Dr. Bilsel did not talk *about the kind of guidance* that he gave to Darlene when he saw her, and there's a reason for that, and you'll hear it in the instructions when the Court gives you the instructions." (Emphasis added.)

Defense counsel's second alleged violation of the Dead Man's Act occurred when he stated:

"Now, you will also be instructed on the subject of contributory negligence *** [and] if you are to get to the point of deciding this, then you could consider whether or not Darlene was contributorially negligent for not following up for her own medical attention and care particularly since she had been *encouraged* to do so in so many different ways ***." (Emphasis added.)

■ As previously discussed, a trial judge's denial of a motion for a new trial (or for a mistrial) will only be reversed by a reviewing court where there is a clear abuse of discretion. (*Lewis*, 217 Ill. App. 3d at 119, 576 N.E.2d at 937.) We first address the statements made by the defendant. Based upon our review of the record, we are satisfied that the statements made by the defendant, even if improper, were not so prejudicial as to deny the plaintiff a fair trial.

■ According to the plaintiff, defense counsel improperly commented upon the fact that the decedent "had been encouraged" to seek follow-up medical attention. Other than characterizing this argument as improper and a "veiled, but meaningful and prejudicial, clever reference," the plaintiff does not say exactly what is improper with this part of defense counsel's closing argument. Our review of the record reveals that this argument was fair and based upon the evidence presented. First, there was evidence that after two separate emergency room visits the decedent was instructed to follow up with her family physician. Second, decedent's own mother testified that she had suggested to the decedent that she see the defendant, which she never did. We therefore find nothing improper about defense counsel commenting upon the fact that the decedent had been "encouraged" to seek medical attention.

As for defense counsel's comments regarding the anticipated Dead Man's Act jury instruction (Illinois Pattern Jury Instructions,

Civil, No. 5.02 (3d ed. 1992)), we find nothing improper. Relying on *Crutchfield v. Meyer* (1953), 414 Ill. 210, 111 N.E.2d 142, plaintiff asserts that defense counsel's remarks "clearly run[ ] afoul of the preclusion of such remarks under the governing precedent in Illinois law." Plaintiff's argument, however, is based on a tortured reading of *Crutchfield*. In that case, the Illinois Supreme Court speaking through Justice Maxwell held:

> "Instructions on competency of witnesses *are proper* if they state the law correctly, but where counsel *** call[s] the jury's attention to the fact that defendant was not permitted to testify *due to the plaintiff's objection*, it clearly appears that counsel is attempting to convey to the jury that defendant has material and valuable evidence to give but is denied this opportunity by plaintiff's technical objection." (Emphasis added.) *Crutchfield*, 414 Ill. at 214, 111 N.E.2d at 144.

There is no suggestion in the instant case that defense counsel misstated the law with respect to the Dead Man's Act. Instead, he merely brought to the jury's attention the reason why the defendant was precluded from testifying about conversations he had with the decedent. Moreover, defense counsel never even came close to suggesting that defendant's inability to testify was due to the *plaintiff's objection*. The bottom line is that defense counsel's comments about the Dead Man's Act come within the permissible bounds of closing argument under *Crutchfield*. (See also *Reid v. Sledge* (1992), 224 Ill. App. 3d 817, 823, 587 N.E.2d 1156, 1161.) We can find nothing in the record to suggest that the trial court abused its discretion in denying plaintiff's motion for a new trial based upon comments made by defense counsel in closing argument.

Plaintiff's final argument is that the trial court erred in refusing to give two non-Illinois Pattern Jury Instructions tendered by plaintiff. Although parties are entitled to have the jury instructed on the issues presented, the applicable legal principles, and the facts that must be proved to sustain a verdict (*Wille v. Navistar International Transportation Corp.* (1991), 222 Ill. App. 3d 833, 839, 584 N.E.2d 425, 429; *Fetzer v. Wood* (1991), 211 Ill. App. 3d 70, 75, 569 N.E.2d 1237, 1240), the trial court has considerable discretion as to the form of jury instructions (*Ostry v. Chateau Ltd. Partnership* (1993), 241 Ill. App. 3d 436, 440, 608 N.E.2d 1351, 1354; *Malek v. Lederle Laboratories* (1984), 125 Ill. App. 3d 870, 872, 466 N.E.2d 1038, 1039), and its refusal to give a tendered jury instruction will result in a new trial only where there is serious prejudice to a party's right to a fair trial. (*Wille*, 222 Ill. App. 3d at

839, 584 N.E.2d at 429; *Thompson v. Abbott Laboratories* (1990), 193 Ill. App. 3d 188, 200, 549 N.E.2d 1295, 1303.) Supreme Court Rule 239(a) (134 Ill. 2d R. 239(a)) generally requires that Illinois Pattern Jury Instructions (IPI) be used. IPI should be used *exclusively* where they correctly and adequately charge the jury. (*Colls v. City of Chicago* (1991), 212 Ill. App. 3d 904, 930, 571 N.E.2d 951, 967; *Lay v. Knapp* (1981), 93 Ill. App. 3d 855, 859, 417 N.E.2d 1099, 1102.) Non-IPI instructions may be used only where there is no appropriate IPI instruction. (*Erickson v. Muskin Corp.* (1989), 180 Ill. App. 3d 117, 127, 535 N.E.2d 475, 481.) However, non-IPI instructions must be carefully scrutinized. *Colls*, 212 Ill. App. 3d at 930, 571 N.E.2d at 967; *Lay*, 93 Ill. App. 3d at 859, 417 N.E.2d at 1102.

■ Although we will address each instruction separately, it must be noted that neither of plaintiff's non-IPI instructions has ever been approved as a jury instruction in any cited case. Plaintiff's proposed jury instruction number 27 reads:

"During the existence of the relationship of physician and patient, a physician is under a duty to give the patient all necessary care as long as the case requires attention, and a lack of diligence in attending to the patient after assumption of the case renders the physician liable for professional negligence."

Plaintiff cites as authority for this instruction: *Smothers v. Butler* (1979), 78 Ill. App. 3d 1018, 1023, 398 N.E.2d 12, 16; *Church v. Adler* (1953), 350 Ill. App. 471, 113 N.E.2d 327, and Annot., 57 A.L.R.2d 379 (1958). Neither *Smothers* (which involved an appeal from summary judgment) nor *Church* (which involved an appeal from dismissal of a complaint) contains any discussion relating to jury instructions. In our view, *Smothers* and *Church* offer no support for framing a jury instruction in this case. Furthermore, plaintiff's proposed instruction number 27 is redundant. Plaintiff's instruction number 13, which was given, contains several submissions that authorized the jury to find negligence based upon a lack of diligence in rendering follow-up care. For instance, subparagraph (b) of instruction number 13 allowed the jury to find the defendant professionally negligent because he "[f]ailed to exercise diligence in attending to his patient *** in that he did not follow-up with her." Lastly, and perhaps most importantly, instruction number 27 would have misled and confused the jury because it presumes the existence of a physician-patient relationship. One need only look at the first sentence of instruction number 27 ("[d]uring the existence of

the relationship of physician and patient, a physician is under a duty") to see this. In the instant case, there was substantial testimony and evidence presented on the critical issue of whether there existed a physician-patient relationship from December 1982 through June 1983. We fully agree with the trial court that instruction number 27 improperly suggests the existence of a physician-patient relationship during the period in question. Whether such a relationship existed was a factual issue that could have gone either way. Thus, we conclude that the plaintiff was not denied a fair trial by the trial court's refusal to give instruction number 27.

We now turn to plaintiff's proposed jury instruction number 28, which reads:

"Where a drug manufacture [*sic*] recommends to the medical profession:

1. The conditions under which its drugs should be prescribed;

2. The disorders it is designed to relieve;

3. The precautionary measures which should be observed; and

4. Warns of the dangers which are inherent in its use, a doctor's deviation from such recommendations is prima facia [*sic*] evidence of negligence."

Plaintiff lifted the language for this instruction from *Ohligschlager v. Proctor Community Hospital* (1973), 55 Ill. 2d 411, 418, 303 N.E.2d 392, 396. In general, the " 'practice of lifting sentences from court opinions and converting them into instructions *** is not a good one, as it often leads to serious error.' " (*Kingston v. Turner* (1987), 115 Ill. 2d 445, 460, 505 N.E.2d 320, 326, quoting *De Rosa v. Albert F. Amling Co.* (1980), 84 Ill. App. 3d 64, 76, 404 N.E.2d 564, 573.) At issue in *Ohligschlager* was whether the plaintiff could withstand a directed verdict in the absence of expert testimony. As far as we can determine, the only case to address the propriety of formulating a jury instruction based on *Ohligschlager* is *Young v. Cerniak* (1984), 126 Ill. App. 3d 952, 467 N.E.2d 1045. In *Young*, the appellate court reversed the trial court for giving an instruction based in part on *Ohligschlager* because, unlike *Ohligschlager*, the defendant in the case before it had presented evidence that: (1) recommendations of drug manufacturers are not conclusive on the standard of care and (2) failure to follow such recommendations is not necessarily a deviation from the accepted standard of care. (*Young*, 126 Ill. App. 3d at 971, 467 N.E.2d at 1057.) In the instant case, the jury heard testimony that: (1) the Physicians' Desk

Reference ("PDR") is neither a practice guide nor a medical text and (2) the drug manufacturer's recommendations for Zarontin and Dilantin do not constitute the standard of care. Furthermore, the trial judge observed that "there was testimony on both sides with regard to what [the] PDR is and what it means and how it's used." It was therefore clearly a question of fact for the jury to determine whether the defendant was negligent in failing to comply with the manufacturer's instructions. Lastly, instruction number 28 is redundant given that subparagraph (e) of plaintiff's instruction number 13 permitted the jury to find the defendant negligent because he "[f]ailed to heed the warnings and follow the recommendations for the prescribing of the drugs Dilantin and Zarontin, as contained in the Physicians Desk Reference." We conclude that the plaintiff's right to a fair trial was far from seriously prejudiced by the trial court's refusal to give instruction number 28.

For the reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

CHAPMAN and MAAG, JJ., concur.