PETER MOORE, Plaintiff-Appellee, v. ANCHOR ORGANIZATION FOR HEALTH MAINTENANCE *et al.*, Defendants-Appellants.

First District (4th Division)   No. 1—96—0245

Opinion filed October 24, 1996.

Hinshaw & Culbertson, of Chicago (E. Michael, Stephen R. Swofford, and Robert E. Nora, of counsel), for appellants.

Robbins, Salomon & Pratt, Ltd., of Chicago (Richard Lee Stavins, Robert M. Winter, and Stephen A. Warner, of counsel), for appellee.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

The plaintiff, Peter Moore, filed the instant medical negligence

action against the defendants, Dr. James C. Rorig and Anchor Organization for Health Maintenance (Anchor). The matter was tried before a jury resulting in a verdict against both defendants in the sum of $6,404,952. The trial court entered judgment on the verdict and, thereafter, denied the defendants' post-trial motions. The defendants have appealed, contending the trial court erred in failing to enter a judgment notwithstanding the verdict by reason of the plaintiff's failure to prove that any negligence on their part was a proximate cause of his claimed injuries. Alternatively, the defendants argue their entitlement to a new trial on the grounds that: (1) the jury's verdict was against the manifest weight of the evidence; (2) the trial court erred in permitting the plaintiff to introduce evidence of his prior statements which were consistent with his trial testimony; (3) the court abused its discretion by permitting the cumulative testimony of five expert witnesses called by the plaintiff; and (4) the court erred in failing to grant the defendants' motion for a mistrial after the plaintiff elicited irrelevant testimony relating to Anchor's policies. For the reasons that follow, we reverse the judgment entered in this action and remand the cause to the circuit court for a new trial.

For a long period prior to the events giving rise to this litigation, the plaintiff suffered from severe ankylosing spondylitis, a progressive, degenerative disease of the spine and joints that destroys cartilage and causes bones to fuse together. In order to correct the effects of his condition, the plaintiff underwent hip replacement surgery in 1984 and a spinal fusion in 1986. Both surgeries were successful and the plaintiff was ambulatory in 1988.

On March 30, 1989, the plaintiff was diagnosed as having an arachnoid cyst in his spinal canal that was crushing his spinal cord. Surgery to remove the cyst was performed on April 4, 1989, by Dr. Kelvin Von Roenn. According to Von Roenn, the surgery to remove the cyst was performed too late, as the plaintiff's spinal cord already had been crushed. As a result of his spinal cord having been compressed by the cyst, the plaintiff can no longer walk independently and is essentially a paraplegic.

The plaintiff filed the instant action against Rorig, his primary care physician, and Rorig's employer, Anchor, charging, *inter alia*, that Rorig was negligent in: (1) failing to examine the plaintiff in November and December 1988; (2) failing to recognize that the plaintiff might have been suffering from a central nervous system disorder; and (3) failing to refer the plaintiff to a neurologist. The plaintiff maintained that during the course of a regularly scheduled appointment with Rorig on November 11, 1988, he complained of dif-

ficulty in sleeping due to muscle spasms in both legs and pain in his joints. According to the plaintiff, Rorig did not examine him; instead, Rorig attributed the plaintiff's insomnia to stress, advised him to stop drinking coffee, and scheduled a follow-up appointment for December 29, 1988.

The plaintiff testified that on December 29, 1988, he told Rorig that his leg spasms had gotten worse after his November 11 appointment. Rorig prescribed a sedative, but again did not examine the plaintiff or refer him to a neurologist.

The plaintiff was out of the country on business from January 8 to January 17, 1989. During that trip, the plaintiff's leg spasms worsened to a point where his entire leg would move. Additionally, he began to experience the spasms during the day as well as at night. The plaintiff testified that when he returned from his trip he attempted to call Rorig on several occasions to complain of the spasms. According to the plaintiff, he reached Rorig by phone on January 25, 1989, and informed him that the spasms were getting worse. After noting that the plaintiff was scheduled to see his rheumatologist, Dr. Bruce McLeod, the following day, Rorig told the plaintiff that McLeod could prescribe any additional medication that might be necessary.

McLeod's notes of the plaintiff's January 26, 1989, appointment reflect that the plaintiff's chief complaint was of muscle spasms in his legs with intermittent quivering which prevented him from sleeping. McLeod did not perform a complete neurological examination of the plaintiff, but he did prescribe a muscle relaxant.

The plaintiff testified that his spasms continued to get worse subsequent to his appointment with McLeod. After making several calls to Anchor, the plaintiff was given a March 7, 1989, appointment with Rorig. When the plaintiff saw Rorig on March 7, he complained of muscle spasms. Rorig noted the plaintiff's complaints and reviewed the notes from the plaintiff's appointment with McLeod. Although Rorig did not examine the plaintiff on March 7, he suspected that the plaintiff had a serious disorder of the central nervous system. Based on that suspicion, Rorig referred the plaintiff to a neurologist and ordered several tests of the plaintiff's peripheral nervous system.

On March 20, 1989, Dr. Sylvan Junger, the neurologist to whom the plaintiff was referred, performed the peripheral nervous system tests ordered by Rorig. During the course of his appointment with Junger, the plaintiff reported that he had been experiencing leg spasms since November 1988. Junger testified that, although the plaintiff's peripheral nervous system tests were negative, he found significant central nervous system involvement. On that same day, Junger informed Rorig of his findings and recommended further testing.

On March 27, 1989, the plaintiff was admitted to the hospital and underwent a series of tests which resulted in the March 30 diagnosis of an arachnoid cyst in his spinal canal and the April 4 surgery to remove the cyst. The records of the plaintiff's hospitalization contain a number of references to the plaintiff's having experienced leg spasms since November 1988.

Anchor admitted the agency relationship between it and Rorig, but both defendants denied that Rorig was negligent in his treatment of the plaintiff. Rorig admitted that he did not examine the plaintiff during his visits on November 11 and December 29, 1988, but denied that the plaintiff ever complained of leg spasms during either visit. And, although he had no recollection of speaking to the plaintiff in January 1989, Rorig denied that the plaintiff ever complained of leg spasms during the course of a phone conversation. According to Rorig, the plaintiff first informed him of his leg spasms on March 7, 1989.

At trial, each of the parties produced a number of physician-witnesses who testified regarding the propriety of Rorig's treatment of the plaintiff. The plaintiff elicited expert medical testimony that Rorig breached the applicable standard of care by failing to perform neurological examinations in November and December 1988 and by failing to refer the plaintiff to a neurologist at that time. A fair reading of the record reveals that the plaintiff's experts based their opinions in this regard, in part, upon the premise that the plaintiff complained of leg or muscle spasms when he saw Rorig in November and December of 1988. Junger, testifying for the plaintiff, conceded, however, that if Rorig was not informed of the plaintiff's leg spasms until March 1989, his treatment of the plaintiff complied with the applicable standard of care. Not surprisingly, the defendants' expert medical witnesses testified that Rorig's treatment of the plaintiff was appropriate, premised upon the assumption that Rorig was first advised of the plaintiff's leg spasms on March 7, 1989.

The plaintiff introduced the testimony of several medical witnesses going to the proximate causal relationship between Rorig's alleged negligence and the plaintiff's ultimate paralysis. For their part, the defendants introduced medical testimony of a lack of any such relationship.

In support of their argument for reversal and the entry of a judgment notwithstanding the verdict, the defendants contend that the plaintiff failed to introduce any evidence establishing "that it was more probable that earlier diagnosis of the plaintiff's cyst would have prevented his injury." The defendants argue that the causation opinions rendered by the plaintiff's experts were based upon the erroneous assumption that surgery to remove the plaintiff's cyst, if

performed at some earlier date, would have cured the cyst, prevented its reoccurrence, and, thus, prevented the plaintiff's ultimate paralysis. Bolstered by the testimony of their own expert, Dr. Marshall Matz, to the effect that surgery to remove an arachnoid cyst cannot change the course of the disease, the defendants conclude that the causation opinions of the plaintiff's experts were mere conjecture and insufficient to satisfy the plaintiff's burden of establishing proximate cause. We disagree.

■ The standard to be employed in entering judgments *non obstante verdicto* (*n.o.v.*) is well settled. "[J]udgments *n.o.v.* [should be] entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967). It is by this standard that a trial court must rule on such a motion, and it is also by this standard that we must judge the propriety of the trial court's action in that regard.

Guided by the admonition of the *Pedrick* court, we have examined the evidence introduced upon the trial of this cause and find that the plaintiff satisfied the burden of establishing the proximate cause element of his action by eliciting testimony from his expert medical witnesses that Rorig's negligence proximately resulted in the plaintiff's present condition of paralysis. Specifically, Dr. Nachman Brautbar and Junger both opined, "within a reasonable degree of medical certainty," that the plaintiff's condition of paraplegia was causally related to Rorig's failure to examine the plaintiff and refer him to a neurologist prior to March 7, 1989. Contrary to the opinions expressed by Matz, Von Roenn testified that surgery of the type performed on the plaintiff in April 1989 halts the progression of the symptoms suffered by the plaintiff, including the loss of sensation leading to paraplegia. When asked to render an opinion within a reasonable degree of medical certainty as to the effect of a failure to examine the plaintiff and refer him to a neurologist in November and December 1988, Junger stated: "It's a difference between him being able to walk today and not being able to walk today." In explaining his opinion, Junger testified that examination and referral in December 1988 would have revealed a problem in the nervous system leading to surgery, "and then at that point the progression would have been halted *** and [the plaintiff] would have *** remained ambulatory."

■ As an alternative, the defendants claim they are entitled to a new trial as the jury's finding on the issue of proximate cause is against the manifest weight of the evidence. Again, we disagree.

Verdicts are set aside and new trials ordered when the verdict of the jury is against the manifest weight of the evidence. *Mizowek v. De Franco*, 64 Ill. 2d 303, 356 N.E.2d 32 (1976). In order to be against the manifest weight of the evidence, conclusions opposite those reached by the trier of fact must be clearly evident, plain and indisputable. *In re Estate of Lukas*, 155 Ill. App. 3d 512, 508 N.E.2d 368 (1987). However, it is the function of the jury to weigh contradictory evidence, judge the credibility of witnesses, and draw ultimate conclusions as to the facts of a case. Consequently, a reviewing court is not at liberty to substitute its judgment for that of the trier of fact merely because different conclusions might be drawn from the evidence presented at trial. *Finley v. New York Central R.R. Co.*, 19 Ill. 2d 428, 167 N.E.2d 212 (1960).

Our reading of the record demonstrates nothing more than contradictory evidence offered by the parties on the question of proximate cause. The jury resolved the issue in favor of the plaintiff, and the record simply fails to demonstrate that an opposite conclusion is clearly evident and indisputably warranted.

The remaining assignments of error claimed by the defendants in support of their request for a new trial all surround evidentiary rulings made by the trial court. Our analysis of these issues is grounded in an acknowledgement that determinations as to the relevance and admissibility of evidence are committed to the sound discretion of the trial court, and its decisions as to these matters will not be reversed absent a clear abuse of that discretion resulting in manifest prejudice to a party. *People v. Hayes*, 139 Ill. 2d 89, 130, 564 N.E.2d 803 (1990).

■ The defendants claim that the trial court abused its discretion by permitting the plaintiff to call five physicians to render cumulative testimony on the question of whether Rorig breached the standard of care in his treatment of the plaintiff. Additionally, they claim that three of these physicians, Dr. Terry Nicola, Dr. Paul Schlesinger and Dr. Junger, lacked the necessary qualifications to render opinion testimony on the issue as they did not practice internal medicine, Rorig's field of medical specialty.

On the issue of the qualifications of Nicola, Schlesinger and Junger to render opinion testimony on the standard of care, suffice it to say that: (1) all three are licensed physicians, as is Rorig (see *Purtill v. Hess*, 111 Ill. 2d 229, 489 N.E.2d 867 (1986); *Dolan v. Galluzzo*, 77 Ill. 2d 279, 396 N.E.2d 13 (1979)); (2) Schlesinger is board certified in internal medicine, as is Rorig; and (3) although not internists, Nicola and Junger testified to their knowledge of the standard of care owed by a medical doctor generally and based their opinions on Rorig's breach of that standard (see *Witherell v. Weimer*, 118 Ill. 2d

321, 515 N.E.2d 68 (1987)). We, therefore, find no merit in the defendants' challenge to their qualifications.

The defendants acknowledge that the admission of cumulative evidence is a matter within the discretion of the trial court. *Simmons v. City of Chicago*, 118 Ill. App. 3d 676, 455 N.E.2d 232 (1983). Nevertheless, they maintain that the court abused its discretion by permitting five physicians to testify as to Rorig's breach of the standard of care. The defendants do not contend, nor could they, that the testimony offered by these witnesses was irrelevant or of minimal probative value. The medical evidence in this case was complicated by the plaintiff's extensive medical history and the uncommon nature of the cyst that formed in his spinal canal. The plaintiff was entitled to develop his case through relevant evidence, and we cannot say that the trial court abused its discretion in permitting the plaintiff to elicit standard of care opinions from five physicians, four of whom had rendered medical treatment to the plaintiff.

■ Next, the defendants contend that the trial court erred in failing to grant their motion for a mistrial after Junger, testifying for the plaintiff, intimated that Anchor's approval policies caused a seven-day delay in the performance of an MRI test on the plaintiff. They argue that, since Anchor admitted its agency relationship with Rorig rendering it liable for any negligence on his part, evidence of Anchor's alleged negligence, absent proof that its acts or omissions independently caused injury to the plaintiff, was irrelevant and highly prejudicial. See *Neff v. Davenport Packing Co.*, 131 Ill. App. 2d 791, 268 N.E.2d 574 (1971). We, however, find no basis to support the defendants' claim that the trial court erred in failing to declare a mistrial.

As the defendants admit in their brief, when Junger attributed the seven-day delay to Anchor's approval policies, the trial court sustained the defendants' objection and, after denying their motion for a mistrial, instructed the jury that the plaintiff was not claiming that the delay was inappropriate or that it caused him any harm. Consequently, absent clear evidence to the contrary, we presume that the jury followed the court's instruction to disregard the testimony, thereby eliminating any potential prejudice to the defendants. *Garcia v. City of Chicago*, 229 Ill. App. 3d 315, 593 N.E.2d 855 (1992). Further, as the plaintiff correctly points out, it was the defendants' cross-examination of Brautbar, the first witness to testify in the case, that introduced the notion of a possible impropriety surrounding the seven-day delay between the time the plaintiff saw Junger on March 7, 1989, and the performance of the MRI on March 27, 1989. Specifically, the defendants attempted to elicit testimony

from Brautbar that Junger failed to order the test done on an emergency basis.

The last issue for consideration in this appeal is the defendants' claim that the trial court erred in permitting the plaintiff to introduce evidence of his own out-of-court statements which were consistent with his trial testimony.

Prior to the commencement of trial, the defendants filed several motions *in limine* seeking an order barring the plaintiff from introducing any evidence as to conversations he might have had with friends about his medical condition or treatment. The trial court denied the motions. After the trial commenced, but before any such testimony was introduced, the defendants again moved to bar the introduction of any evidence relating to the plaintiff's conversations with his friends and family, and again the motion was denied. The parties then stipulated to the defendants' continuing objection to any testimony regarding "prior consistent statements and *** relating to Mr. Moore's statements to friends or family members or whomever relating to his muscle spasms and complaints of muscle spasms in as early as November of '88 or October of '88." Immediately after the stipulation, the plaintiff called three of his friends to testify about conversations they had with the plaintiff regarding his medical condition.

Penelope Springall testified that she had several conversations with the plaintiff between January 8 and 17, 1989, during which the plaintiff complained of leg spasms. According to Springall, the plaintiff stated that he had been experiencing leg twitches and had seen his doctor several times. The plaintiff told her that his doctor said the condition was stress related, but the plaintiff was not convinced of the explanation.

Joan Wallace testified to a conversation in September or October of 1988, during which the plaintiff mentioned that he was having leg spasms. She also testified to a telephone conversation with the plaintiff in mid-January 1989, during which the plaintiff told her that his leg spasms were getting worse.

After Wallace testified, the defendants moved for a mistrial, which the court denied. The plaintiff then called Jean Maunder to testify. Maunder related the substance of three particular conversations with the plaintiff. In testifying to a conversation that occurred in November 1988, she stated:

> "I recall that he told me he was experiencing spasms of his legs. He described them as jerky movements of both of his legs that would awaken him at night and he told me he was planning to see his doctor related to these spasms, to see Dr. Rorig."

According to Maunder, she had another conversation with the plaintiff several days thereafter, and the plaintiff told her that "he had seen Dr. Rorig for his leg spasms and that Dr. Rorig's impression was that they were probably stress related." Last, she testified to a conversation in January 1989, during which the plaintiff told her "that his leg spasms were worse since he had made his trip, that he was having them more frequently than what he had had before[,] and that he had called to try and speak with Dr. Rorig."

Our resolution of this final issue requires a determination of whether the testimony of Springall, Wallace and Maunder as to their conversations with the plaintiff constitutes inadmissible hearsay, and, if it does, whether the admission of that testimony requires us to reverse the judgment in this case and remand the matter for a new trial.

■ Illinois has long subscribed to the general rule that proof of a witness's out-of-court statements is inadmissible when offered solely to corroborate his in-court testimony on the same subject. *Waller v. People*, 209 Ill. 284, 287, 70 N.E. 681 (1904); *Stolp v. Blair*, 68 Ill. 541 (1873); see also *People v. Clark*, 52 Ill. 2d 374, 288 N.E.2d 363 (1972). The reason for the rule is evident: "The improper bolstering of a witness' credibility through the use of prior consistent statements 'preys on the human failing of placing belief in that which is most often repeated.' " *People v. West*, 263 Ill. App. 3d 1041, 1047, 636 N.E.2d 948 (1994), quoting *People v. Sanders*, 59 Ill. App. 3d 650, 654, 375 N.E.2d 921 (1978). Addressing this very issue, Wigmore on Evidence states:

> "A former consistent statement helps in no respect to remove such discredit as may arise from a contradiction by other witnesses. When B is produced to swear to the contrary of what A has asserted on the stand, it cannot help us, in deciding between them, to know that A has asserted the same thing many times previously. If that were an argument, then the witness who had repeated his story to the greatest number of people would be the most credible." 4 J. Wigmore, Evidence § 1127 (Chadbourn rev. ed. 1972).

But, as noted in *People v. Harris*, 123 Ill. 2d 113, 139-40, 526 N.E.2d 335 (1988):

> "A narrow exception to this rule has been created where it is charged that the testimony is recently fabricated or that the witness has some motive for testifying falsely. Then a prior consistent statement may be admitted, but only if made before the motive to fabricate arose. [Citations.] In such an instance, proof that the witness gave a similar account of the occurrence, when the motive to lie was nonexistent, or before the effect of the account

could be foreseen, makes the prior consistent statement admissible. [Citation.]"

As the plaintiff correctly argues, a charge of recent fabrication or motive to testify falsely need not be explicit in order to satisfy the first prerequisite to the introduction of prior consistent statement evidence. Even the suggestion of recent fabrication or motive to lie is sufficient. *People v. Henderson*, 142 Ill. 2d 258, 310, 568 N.E.2d 1234 (1990). According to the plaintiff, the defendants implied that his assertion of having complained of leg spasms to Rorig in November and December 1988, and by phone in January 1989, was a fabrication. The plaintiff supports his contention in this regard with statements of the trial court describing the defendants' opening statement as a clear charge of fabrication. And, since the testimony of Springall, Wallace and Maunder was restricted to statements made by the plaintiff prior to his having been diagnosed as suffering from a cyst in the spinal canal, that is, before he had any motive to fabricate, the plaintiff argues that the trial court properly admitted the testimony as falling under the exception articulated by the court in *Harris*.

The statements of the trial court notwithstanding, our examination of the defendants' opening statement fails to reveal any charge of fabrication, either explicit or implicit. The plaintiff can only direct this court to those portions of the defendants' opening statement where the jury was informed that, contrary to the plaintiff's version of events, Rorig would testify that the plaintiff never informed him in November and December 1988 that he was experiencing leg or muscle spasms. The plaintiff seems to argue to this court, as he did before the trial court, that the introduction of contradictory evidence implies fabrication. The trial court seemed to be of the opinion that the mere fact that Rorig would testify contrary to the plaintiff's version of events satisfied the first prerequisite for the admission of the plaintiff's prior consistent statements. Our conclusion in this regard is supported by the trial court's own reasoning. When the defendants moved to bar this type of evidence immediately prior to Springall's testimony, the court stated:

"I think this is—I'm taking this as a motion to reconsider, and I'm going to deny the motion. You made your record certainly, but I think there is too fine a point trying to be made here. You're basically saying Dr. Moore never told Dr. Rorig about this. It doesn't matter whether you call it wrong, mistaken, lying, inaccurate, however you describe it. You're saying he never said that. We disagree that he ever said that.

And they're entitled to say he did—here is evidence to show that he contemporaneously with that saying [*sic*] to other people

this is what my complaints were. I'm going to let the jury give it weight."

We know of no case that stands for the proposition that the mere introduction of contradictory evidence constitutes, without more, an implied charge of fabrication. In fact, the contrary is true. See *Stolp*, 68 Ill. at 544-45; *West*, 263 Ill. App. 3d 1041, 636 N.E.2d 948; *Johnson v. Plodzien*, 31 Ill. App. 2d 222, 228-29, 175 N.E.2d 560 (1961). Our research reveals that the cases cited by the plaintiff sanctioning the admission of evidence of prior consistent statements have one of two common factual denominators: either an explicit charge of fabrication had been made by the opposing party prior to the introduction of a witness's prior consistent statement (see *People v. Titone*, 115 Ill. 2d 413, 505 N.E.2d 300 (1986); *Ashford v. Ziemann*, 99 Ill. 2d 353, 459 N.E.2d 940 (1984)), or the witness's motive to testify falsely was implied by the opponent's reference to facts extrinsic to the cause on trial (see *People v. Williams*, 147 Ill. 2d 173, 588 N.E.2d 983 (1991); *Harris*, 123 Ill. 2d 113; *People v. Shum*, 117 Ill. 2d 317, 512 N.E.2d 1183 (1987); *Gates v. People*, 14 Ill. 433 (1853); *People v. Askew*, 273 Ill. App. 3d 798, 652 N.E.2d 1041 (1995)). Neither circumstance is present in the instant case. Further, contrary to the trial court's understanding, evidence of prior consistent statements is not admissible merely to rebut a charge or inference of mistake or inaccuracy. See *Hayes*, 139 Ill. 2d at 138.

■ In this case, the plaintiff's prior consistent statements were hearsay and did not fall within any recognized exception to the general rule against their admission into evidence. Consequently, we find that the trial court erred in permitting Springall, Wallace and Maunder to testify to their conversations with the plaintiff and, in particular, to the plaintiff's statements regarding his medical condition, his complaints to Rorig, and the treatment that he received for that condition.

Not every erroneous admission of a prior consistent statement constitutes reversible error. The prejudicial nature of the evidence must be judged on a case-by-case basis. *Henderson*, 142 Ill. 2d at 311. When, however, evidence of a prior consistent statement is highly prejudicial because it makes the testimony of a witness more believable on a critical fact in controversy and it is impossible to tell whether the jury relied upon that evidence, the statement's erroneous admission warrants reversal of the jury's verdict and an order remanding the case for a new trial. See *People v. Smith*, 139 Ill. App. 3d 21, 486 N.E.2d 1347 (1985).

Because we find that the trial court erred in admitting evidence of the plaintiff's prior consistent statements and also find that those

statements were introduced solely to bolster the plaintiff's in-court testimony on a critical fact in controversy, we reverse the judgment entered against the defendants and remand this case to the circuit court for a new trial.

Reversed and remanded.

THEIS and O'BRIEN, JJ., concur.