JAMES R. SBARBORO, Independent Adm'r of the Estate of John L. Sbarboro, Deceased, Plaintiff-Appellant, v. RAGHU VOLLALA *et al.*, Defendants-Appellees.

First District (3rd Division) No. 1—07—3236

Opinion filed June 30, 2009.

Shefsky & Froelich, Ltd. (J. Timothy Eaton and Patricia S. Spratt, of counsel), and Clifford Law Offices (Robert A. Strelecky and Robert P. Sheridan, of counsel), both of Chicago, for appellant.

Bollinger, Ruberry & Garvey (Krista R. Frick and Martin P. Head, of counsel), Hall, Prangle & Schoonveld, LLC (Hugh C. Griffin, of counsel), and SmithAmundsen, LLC (Carmel Cosgrave, Michael Resis, and Jennifer Stuart, of counsel), all of Chicago, for appellees.

JUSTICE QUINN delivered the opinion of the court:

Plaintiff, surviving brother of John Sbarboro and independent administrator of the estate of John Sbarboro, filed a lawsuit alleging medical negligence against defendants, Dr. Raghu Vollala, Dr. Alan B. Spacone, Dr. Alan B. Spacone, Ltd., a Corporation, VHS of Illinois, Inc., d/b/a MacNeal Health Network, MacNeal Hospital, MacNeal Home Care, and MacNeal Hospice (MacNeal Hospital), claiming that Dr. Vollala failed to diagnose and treat the decedent's aortic dissection. Following a trial, the jury returned a verdict in favor of defendants and against plaintiff. Plaintiff filed a posttrial motion requesting a new trial, which the circuit court denied. On appeal, plaintiff contends that the circuit court abused its discretion in denying his posttrial motion for a new trial where: (1) the circuit court allowed evidence of Dr. Vollala's discharge summary pertaining to the decedent to be presented to the jury despite the fact that the document was not produced to plaintiff until at trial; (2) plaintiff was not allowed to introduce evidence that Dr. Vollala had failed his board-certification examination; and (3) the substantial errors in this case were not harmless because it was a close case on the facts. For the following reasons, we affirm.

## I. BACKGROUND

On April 21, 2001, John Sbarboro (the decedent) began experiencing chest pain sometime between 9 p.m. and 11 p.m. On April 22, 2001, at about 4:30 a.m., John took a taxi from his home to the emergency room at MacNeal Hospital in Berwyn, Illinois. Dr. Alan Spacone treated John in the emergency room. Defendant Dr. Vollala was the attending physician on call to accept patients who did not have a primary care physician and needed to be admitted to the hospital.

At about 10:10 a.m., after several hours in the emergency room, Dr. Vollala admitted John to MacNeal Hospital. At 10:55 a.m., Dr. Vollala had John transferred to the telemetry unit for heart monitoring. John continued to experience chest pain and two successive tests for cardiac enzymes were ordered to rule out a myocardial infarction (MI). Both tests came back negative. At about noon, the telemetry nurse telephoned Dr. Vollala and Dr. Vollala examined John at about 1 p.m. At 1:30 p.m., Dr. Kelly Choi, an intensive care unit (ICU) fellow, evaluated John and ordered a third test for cardiac enzymes. At 3:56 p.m., John died at MacNeal Hospital from an aortic dissection, which is a tear in the lining of the aorta.

At trial, plaintiff called Dr. Vollala as an adverse witness. Dr. Vollala testified that at about 10:10 a.m., on April 22, 2001, he spoke on

the telephone with Dr. Spacone from the emergency room. Dr. Spacone informed Dr. Vollala that John was complaining of chest pain, but all of his tests were negative. Dr. Spacone advised Dr. Vollala that he was going to admit John to rule out an MI and have a cardiac fellow see him. At about noon, Dr. Vollala testified that he gave telephone orders to Nurse Karen Manyak on the telemetry floor to give John an injection of 50 milligrams of Demerol every six hours or as needed for back pain. At about 1 p.m., Dr. Vollala saw John, took a history, then transferred John to the ICU and ordered a nitroglycerin drip. Dr. Vollala noted in John's history that he had experienced chest pain for more than five hours prior to admission and complained of retrosternal pain that sometimes radiated into his left back.

Dr. Vollala testified that the policy at MacNeal Hospital at that time required that when a patient was transferred to the ICU, that patient would be examined by an ICU fellow. Pursuant to this policy, after John was transferred to the ICU, Dr. Kelly Choi was called for a consult. At about 2 p.m., Dr. Choi called Dr. Vollala and told him that an MI had been ruled out and that she had countermanded the ICU transfer order and suggested that John remain in the telemetry unit. Dr. Vollala testified that he agreed that John should be monitored in the telemetry unit and that another set of tests for cardiac enzymes had been ordered by the ICU team.

Dr. Vollala testified that he took John's history and physical examination but did not chart them at the time. Dr. Vollala agreed that aortic dissection is a potentially life-threatening disease that should be ruled out, but Dr. Vollala testified that he had no reason to suspect that John was suffering from that ailment. Dr. Vollala did not consider ordering a CT or CAT scan which, depending on when it is taken, would have shown evidence of an aortic dissection. The decedent also had an allergy to iodine, which is used during a CAT scan. Dr. Vollala testified that MacNeal Hospital had a policy that required an attending physician to place a discharge summary in the patient's chart within 24 hours, but he did not remember if he prepared a discharge summary for John. Plaintiff's counsel asked Dr. Vollala, "Nowhere in this record is there a discharge summary prepared by you, correct?" Dr. Vollala answered that he could not remember.

Following Dr. Vollala's adverse examination by plaintiff, counsel for defendant MacNeal Hospital asked for a recess and, outside the presence of the jury, advised the parties and the circuit court to the existence of a discharge summary that was dictated and transcribed in July 2001. Plaintiff's counsel stated that this was the first time that he was shown the discharge summary despite defendant's counsel

receiving notice to produce a complete set of John's hospital chart. Counsel for defendant MacNeal Hospital indicated that the discharge summary had come to her with the file when her law firm had substituted in as counsel and she had assumed that the discharge summary had been previously produced through discovery. Plaintiff's counsel then requested that the circuit court bar evidence of the discharge summary. At the suggestion of Dr. Vollala's counsel, the circuit court provisionally barred the use of the discharge summary and decided to revisit the matter the following day after the parties had more time to consider the matter.

During cross-examination by his own attorney, Dr. Vollala testified that he did not see any indication that John had an aortic dissection and the emergency room records did not show any description of pain that was suggestive of an aortic dissection. Dr. Vollala testified that the emergency room records also did not show a history of hypertension or tachycardia. Dr. Vollala testified that a complaint of back pain is not necessarily consistent with an aortic dissection. Dr. Vollala testified that the protocol to rule out an MI is to monitor the patient's vitals, give the patient a nitroglycerin drip and provide the patient with morphine for pain and beta blockers for a fast heartbeat. A set of cardiac enzymes is performed to rule out myocardiac damage at timed intervals, a second set after six hours, and a third set after nine hours, and two EKGs are then done to rule out damage to the heart.

Dr. Vollala testified that when he saw John, his blood pressure was normal, there was no tachycardia, hemodynamic instability or neurological symptoms and his heart had no murmur. Dr. Vollala testified that John had retrosternal pain, which is a symptom of unstable angina, heart attack or coronary insufficiency, not aortic dissection. Dr. Vollala testified that John's back pain also responded to Demerol, which is inconsistent with an aortic dissection. Dr. Vollala testified that an aortic dissection is associated with "a very sudden onset [of] sustained and a sheering [sic] ripping pain" that is not usually controlled by pain medication. Dr. Vollala also noted that John's family had a history of coronary heart disease, which is important because John could have also inherited the same disease. Dr. Vollala testified that he had no disagreement with Dr. Choi over the transfer of John to the telemetry unit or any other order regarding cardiac enzymes.

The following day, prior to resuming testimony, Dr. Vollala's counsel requested a curative instruction. Plaintiff stood on his motion to bar the discharge summary for any use "giving rise to new opinions or a new basis for any old opinion" by the parties' experts. Plaintiff also requested a limiting instruction and the opportunity to conduct further adverse examination of Dr. Vollala. Plaintiff made the following statement:

"I stand on my motion to bar this discharge summary for any use in this trial after today, and why I say that is because this was never given to any of my experts. They never had it in any of my examination of any of the defendants or any of the witnesses throughout discovery including defense expert witnesses.

\* \* \*

If the Court is inclined to give some type of limiting instruction or explanatory instruction to the jury that the discharge summary does exist, my position would be that the jury also needs to know that this was not produced by the hospital until after Dr. Vollala's testimony in this courtroom, otherwise the logical inference is that I was trying to confuse or accuse Dr. Vollala of doing something that he didn't do, and it would draw a negative inference on me; and I think that would be highly prejudicial in the case.

However, now that the discharge summary has been produced and as I read it, I would like to question Dr. Vollala about the discharge summary and some of the matters within the discharge summary. This was his document. For all I know he may have had a copy of this document. And I'll just say this in passing. In every situation involving the hospital care that I've ever been aware of, hospitals routinely send to the attending physician copies of all things that doctors dictate like discharge summaries, history and physicals, as well as reports of laboratories, et cetera. These are commonly—these documents are usually like three paper copies where one copy goes to medical records, one copy goes somewhere else, and one copy goes to the doctor.

So he may have very well had this summary. It's his document. He dictated it. He should have known that he dictated a discharge summary. We now have it, and it contains material that I was not provided with during discovery that I would have used to question Dr. Vollala; and there's material in there that I would have used on my adverse examination of Dr. Vollala, and I would like to do that."

The circuit court agreed to give a limiting instruction and granted plaintiff's request to reopen his adverse examination of Dr. Vollala. The court ordered that this examination be conducted in the afternoon in order to provide the parties additional time to prepare. Prior to resuming Dr. Vollala's adverse examination, the circuit court instructed the jury as follows:

"At the close of plaintiff's direct examination of Dr. Vollala counsel for MacNeal Hospital became aware for the first time the hospital had not produced a two page typed written discharge summary, which neither plaintiff's counsel nor counsel for Dr. Vollala had in their possession. \*\*\* Hospital counsel immediately brought this to the attention of the Court and all the parties. \*\*\*.

Does everybody understand that? So based on that then I'm going to allow [plaintiff's counsel] now to ask additional questions of Dr. Vollala because it was turned over last night. So I'm going to allow [plaintiff's counsel] to again question Dr. Vollala based on solely the discharge summary."

Dr. Vollala testified that a discharge summary is prepared when a patient is going home to explain why the patient came in, what tests were performed, what happened and what instructions the patient was given. Dr. Vollala explained that a discharge summary is only a guideline of what happened to a patient and does not include every detail regarding the patient. Dr. Vollala testified that John's discharge summary was not signed by him, but that his signature was stamped on it. Dr. Vollala explained that sometimes a summary was prepared by a resident or another doctor familiar with the case and that he usually would review it before his signature was stamped. Dr. Vollala testified that he may have made a mistake when he testified that a summary had to be prepared within 24 hours of discharge and acknowledged that John's summary was dictated and transcribed on July 25, 2001, three months after John's death. Dr. Vollala testified that the discharge summary contained errors and that he had not read and corrected it.

Following Dr. Vollala's testimony, both defendants moved for a mistrial. Plaintiff did not move for a mistrial. Instead, plaintiff stated that he was properly allowed to "test the credibility" of Dr. Vollala by "fully question[ing]" Dr. Vollala regarding the hospital's policy to prepare discharge summaries. The circuit court denied defendants' motions for a mistrial.

Dr. Barry Ramo, plaintiff's expert, testified that he is a practicing physician, board certified in both internal medicine and cardiovascular disease. Dr. Ramo testified that he reviewed John's medical records, as well as the deposition testimony of Drs. Vollala and Choi, and the defense experts. Dr. Ramo opined that when John's cardiac enzyme tests came back normal, in conjunction with the chest and back pain, an aortic dissection should have become part of Dr. Vollala's differential diagnosis. Dr. Ramo testified that the record indicated that there was never any consideration given to anything other than John having a coronary problem. Dr. Ramo testified that under the applicable standard of care, at 11:40 a.m. and 1 p.m. on the date of John's death, Dr. Vollala was obligated to order diagnostic testing to rule out an aortic dissection.

Dr. Ramo also testified that despite John's reported iodine allergy, by asking John about his allergy and medication, an adverse reaction to the iodine required for a CAT scan could have been prevented. Dr.

Ramo testified that the standard of care required Dr. Vollala to discuss a CAT scan with John or consider another diagnostic measure to rule out an aortic dissection. Dr. Ramo testified that under the standard of care, if Dr. Vollala had ordered a CAT scan, the aortic dissection would have been found and treated by a cardiovascular surgeon. Dr. Ramo opined that these deviations from the standard of care caused and contributed to John's death.

Dr. Samuel Sadow, plaintiff's expert, testified that he was a practicing cardiothoracic surgeon. Dr. Sadow testified that throughout his career, he managed over 125 cases of aortic dissections. Dr. Sadow testified that John had a Type III aortic dissection, which includes signs and symptoms of hypertension, pulse deficits, hypotension, chest pain, paraplegia, paralysis, and tachycardia. Dr. Sadow testified that patients with Type III aortic dissection may complain of back pain that may wax and wane. Dr. Sadow testified that John's sudden onset of pain was consistent with an aortic dissection, but John also presented signs and symptoms consistent with a myocardial infarction.

Dr. Sadow testified that there are three types of diagnostic tests that can reveal an aortic dissection, which include a CAT scan of the chest, an MRI, and a transesophageal echocardiograph (TEE). An aortic dissection can be treated pharmacologically with beta blockers and fast-acting hypertensive medications given intravenously. Dr. Sadow opined that if after an MI had been ruled out, a cardiothoracic surgeon had been called at either noon or 1:30 p.m., then the surgeon could have ordered one of the diagnostic tests and treated John's aortic dissection, thereby preventing John's death.

During cross-examination, Dr. Sadow testified that a Type III aortic dissection is an uncommon medical complication in an individual such as John, who was 48 years old and had no long-standing history of hypertension. In 30 years of practice, the only other time that Dr. Sadow recalled seeing a 48-year-old patient with an aortic dissection was a few weeks prior to trial. Dr. Sadow testified that typically the peak incidence of aortic dissection is in the age group of 60 years old. Dr. Sadow testified that a cardiothoracic surgeon, like himself, is usually not consulted until there is a diagnosis or a high index of suspicion when the patient is evaluated. Dr. Sadow testified that John had three documented episodes of high blood pressure over 11½ hours at Mac-Neal Hospital, but otherwise his blood pressure was within normal limits. Dr. Sadow testified that blood pressure within normal limits would be an uncommon finding in a patient with a Type III aortic dissection. Dr. Sadow testified that John also had a normal heart rate except for a few isolated episodes of a slow rate over 11½ hours,

which one would not expect to see in a younger patient with an aortic dissection. John's chest X-rays also did not show a widening of the mediastinum, which is one of the signs of an aortic dissection. Dr. Sadow also testified that a patient with an iodine allergy, such as John, can be treated with drugs before undergoing a CT scan, but it is a lengthy process. Dr. Sadow testified that a dissection can rupture, such as in John's case, even with a diagnosis of aortic dissection and treatment. Dr. Sadow testified that he had never saved the life of a patient whose dissection had ruptured.

Dr. Vollala presented expert testimony from Dr. Gregory Lewis, who was board certified in internal medicine, cardiovascular disease, and cardiac electrophysiology. Dr. Lewis testified that Dr. Vollala complied with the standard of care as it related to John's treatment and Dr. Vollala's treatment did not cause or contribute to John's death. Dr. Lewis explained that a propagating aortic dissection is a tear in the innermost lining of the aorta, so that blood seeps into the wall and causes a longer tear. Dr. Lewis testified that an aortic dissection is uncommon for a 48-year-old patient, such as John. Dr. Lewis testified that John showed no evidence of an aortic dissection on April 22, 2001. John did not exhibit symptoms, where his chest X-ray did not show an enlarged mediastinum, his heart sounds lacked a "whoosing" sound in other vascular vessels, and he was not hypertensive. John also did not have risk factors associated with an aortic dissection, but John did have risk factors for coronary artery disease.

Dr. Lewis testified that the emergency room plan to admit John to the telemetry floor and treat him for pain was reasonable and it was also reasonable for Dr. Vollala to rely on Dr. Spacone without performing a differential diagnosis at that time. Dr. Lewis testified that nothing in the signs or symptoms raised an issue as to an aortic dissection when John was admitted to the telemetry unit at 11:40 a.m., and an MI had not been ruled out since cardiac enzyme testing was still ongoing. Dr. Lewis testified that the standard of care did not require a CAT scan or cardiothoracic consult and it was appropriate to order the MI protocol.

Dr. Lewis also testified that when John was examined by Dr. Choi in the ICU, an acute coronary syndrome was not ruled out and the plan to continue with cardiac enzyme tests and check for pancreatitis was reasonable. Dr. Lewis further testified that Dr. Vollala conformed with the standard of care when he examined John at 1 p.m. Since John did not exhibit any of the findings that one would expect to see for a propagating aortic dissection, the standard of care did not require Dr. Vollala to consider an aortic dissection and order a CAT scan or cardiothoracic consult. Dr. Lewis testified that John's dissection

ruptured at 3:35 p.m., and he did not show any signs of dissection prior to that time. Dr. Lewis opined that John's death was caused by the ruptured aorta and no medical treatment could have prevented it.

Dr. Vollala also presented expert testimony from Dr. Robert Breyer, who testified that he was a cardiothoracic surgeon and board-certified thoracic surgeon. Dr. Breyer testified that an aortic dissection is uncommon in this case, where John was 48 years old and had normal blood pressure with no history of hypertension. Dr. Breyer testified that Dr. Vollala met the standard of care in his treatment of John and did not cause or contribute to John's death. Prior to 3:35 p.m. when the dissection ruptured, John did not present the signs and symptoms of an aortic dissection, such as knife-like, tearing pain, long-standing high blood pressure, a widening of the mediastinum, neurological symptoms, or a loss of pulse in an arm or leg.

Dr. Breyer testified that at noon, it was appropriate for Dr. Vollala to order Demerol for John's complaints of back spasms. Dr. Breyer testified that a complaint of retrosternal pain sometimes radiating into the left back would not bring an aortic dissection to mind because the pain can be caused by a number of things, including, most commonly in males near the age of 50, a cardiac condition. Dr. Breyer's opinion was that the standard of care did not require Dr. Vollala to order a CAT scan, TEE, or surgical consult at 11:40 a.m. or 1 p.m. Dr. Breyer explained that nothing that Dr. Choi documented would lead a reasonably well-qualified physician to include an aortic dissection in a differential diagnosis. Dr. Breyer testified that it was reasonable to include pancreatitis in John's differential diagnosis, which was a more likely explanation for his signs and symptoms.

Dr. Breyer also testified that if a CAT scan had been ordered at noon, John's death could not have been avoided. Dr. Breyer explained that it would have taken approximately 13 hours for pretreatment of John's iodine allergy with steroids and antihistamines for an elective CAT scan. Dr. Breyer testified that a TEE would not have changed the outcome because it would not have resulted in any different treatment. Dr. Breyer explained that because John was in the target range for controlling blood pressure and he had a low heart rate, John would have been kept under observation and he was not a candidate for surgery.

Dr. Michael Frank testified as an expert for MacNeal Hospital. Dr. Frank testified that he was a board-certified cardiothoracic surgeon. Dr. Frank testified that Dr. Choi complied with the standard of care and that her care did not cause or contribute to John's death from the rupture of an aortic dissection. Dr. Frank testified that Dr. Choi's differential diagnosis of pancreatitis was appropriate and her recom-

mendation that John remain in the telemetry unit was within the standard of care. Dr. Frank testified that Dr. Choi did not have any reason to consider an aortic dissection in her differential diagnosis because John did not present any symptoms of aortic dissection, such as a severe, sharp pain different from that described by John. Dr. Frank testified that Dr. Choi's recommendation for another set of enzymes and an EKG complied with the standard of care because John still needed to be evaluated for possible acute coronary syndrome.

Dr. Frank testified that the standard of care did not require Dr. Choi to consider a CAT scan when acute coronary syndrome or an MI had not been ruled out and John had no signs of an aortic dissection. Dr. Frank testified that John was atypically young for an aortic dissection. Dr. Frank testified that even if Dr. Choi had considered an aortic dissection after she completed her evaluation at 2 p.m., there would not have been enough time to diagnose and treat the condition before the dissection ruptured at 3:55 p.m. Dr. Frank testified that the treatment for an aortic dissection is to control the pain, heart rate and blood pressure with beta blockers, but the majority of patients with an aortic dissection diagnosis do not survive. Dr. Frank testified that the mortality rate is 40% for even those patients who survive the acute phase.

During closing arguments, plaintiff introduced the discharge summary into evidence and used an enlargement of the document to present arguments before the jury. Plaintiff made the following arguments:

"Was I confusing to anyone when I had Dr. Vollala on that witness stand? I had to impeach him at least six times with inconsistent statements he made at a deposition, and he now changes his testimony in this courtroom. Was that confusing?

Let me take the confusion out of that. A person says one thing one day, a person says something completely the opposite the next day. Is that evidence of confusion or is that an absolute lack of credibility? I say it is an absolute lack of credibility.

Dr. Vollala's version of the events had to be pieced together by others, including his experts, to defend him because his recollection and what he said about what happened here doesn't make any sense.

* * *

Was I confusing when Dr. Vollala is in this witness box and on Monday he tells you all that the hospital has a requirement that a discharge summary be prepared within 24 hours of a patient's discharge or in this case the death of a patient.

On Tuesday he told you when he was confronted with the discharge summary and he was shown that this discharge summary was dictated on July 25th of 2001, some three months later, that, 'Oh, well, I was mistaken. There really isn't a policy. You can dictate these things anytime you want.' I had to establish through him what is the purpose of a discharge summary. You know, they're telling you not that, oh, I'm creating all these non-issues in the case. I'm drawing attention to all the non-issues. Well, ladies and gentlemen, a discharge summary is supposed to be just that, a summary of what happened to your patient, what the presenting problems were, what you did for the patient and what was the ultimate response to the treatment. This is to be a permanent record in a patient's medical chart. If the patient had lived, there may be others down the road, other hospitalizations. Other doctors may need these records and rely upon these records. These are records that have an importance because it is the summary of the total of what transpired during the admission. This was dictated three months after the fact. Was I confusing when I showed this to Dr. Vollala and I say to him, 'Well, here now is your discharge summary,' and he first tells me, 'That's not my summary. All right. Whose summary is it? Oh, some resident dictated this. Who? I don't know. Well, that's your signature on the bottom. No, that's not my signature. That's my stamp. Well, you reviewed this before you put your stamp on it? No, I never reviewed it.'

We're talking about credibility of witnesses in this case and who's to be believed and not. *** I think this was Dr. Vollala's summary that he now is not willing to take credit for, and maybe the reason being is three months after the fact when a summary is being dictated about events that ended up in a bad result at the hospital."

Following deliberations, the jury returned a verdict in the defendants' favor and the circuit court entered judgment on that verdict. Plaintiff filed a motion for a new trial alleging, *inter alia*, that he was entitled to a new trial due to the late disclosure of the discharge summary and where he was not allowed to introduce evidence that Dr. Vollala had failed his board-certification examination.

In a 19-page written order, the circuit court denied plaintiff's motion for a new trial. In doing so, the circuit court stated that it was "puzzled by plaintiff's claim of prejudice where plaintiff's counsel was granted all the relief he requested" with respect to the discharge summary. The circuit court found that plaintiff failed to show that the late disclosure of the discharge summary or any of the other alleged discovery violations caused the jury to base its verdict on passion or prejudice and not on the evidence. The circuit court also determined that the fact that Dr. Vollala failed his board-certification examination

was irrelevant since Dr. Vollala did not provide standard of care testimony or any other opinions as an expert. Plaintiff now appeals.

## II. ANALYSIS

### A. The Discharge Summary

Plaintiff first contends that the circuit court abused its discretion in denying his motion for a new trial where plaintiff was prejudiced by Dr. Vollala's testimony regarding the discharge summary that was produced at trial.

The standard which we must apply regarding the trial court's decision to deny plaintiff's motion for a new trial, is abuse of discretion. *Bosco v. Janowitz*, 388 Ill. App. 3d 450, 461 (2009). A new trial is granted only " 'if the verdict is contrary to the manifest weight of the evidence.' " *Bosco*, 388 Ill. App. 3d at 461, quoting *Mizowek v. De Franco*, 64 Ill. 2d 303, 310 (1976). A verdict is contrary to the manifest weight of the evidence "when the opposite conclusion is clearly evident or when the jury's findings prove to be unreasonable, arbitrary and not based upon any of the evidence." *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 179 (2006). To determine whether the trial court abused its discretion, this court must consider " 'whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial.' " *Bosco*, 388 Ill. App. 3d at 461, quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 455-56 (1992).

Here, defendants argue that plaintiff forfeited this issue where plaintiff requested and consented to the circuit court's ruling regarding the discharge summary document.

" 'It is fundamental to our adversarial process that a party waives his right to complain of an error where to do so is inconsistent with the position taken by the party in an earlier court proceeding.' " *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000), quoting *Auton v. Logan Landfill, Inc.*, 105 Ill. 2d 537, 543 (1984). A party cannot complain of error which he induced the court to make or to which he consented. *McMath*, 191 Ill. 2d at 255. " 'The rationale of this rule is obvious. It would be manifestly unfair to allow one party a second trial upon the basis of error which he injected into the proceedings.' " *Auton*, 105 Ill. 2d at 543, quoting *Ervin v. Sears, Roebuck & Co.*, 65 Ill. 2d 140, 144 (1976).

As is clearly set forth above, after counsel for MacNeal Hospital informed the circuit court that there was a discharge summary in existence, arguments were had outside the presence of the jury. After an extensive discussion among the parties about the best way to handle the question of the discharge summary, the circuit court requested that the parties review the newly disclosed discharge summary over

the evening and in the morning present arguments regarding the document. The next morning, plaintiff requested that the circuit court allow additional adverse examination of Dr. Vollala about the discharge summary and that any curative instruction inform the jury that the discharge summary was only provided after Dr. Vollala's testimony in court. While plaintiff stated "I stand on my motion to bar this discharge summary for any use in this trial *after today*," plaintiff's motion only related to barring the use of the discharge summary after plaintiff's additional examination of Dr. Vollala on that date. (Emphasis added.) The circuit court therefore granted all of the relief plaintiff requested. The record shows that plaintiff was permitted the opportunity to extensively examine Dr. Vollala regarding the disclosure summary and the circuit court, over the objection of defendant Dr. Vollala, provided a curative instruction to the jury. In addition, plaintiff introduced the discharge summary into evidence as a plaintiff's exhibit and presented closing arguments regarding the discharge summary and Dr. Vollala's credibility. Accordingly, plaintiff cannot now complain of error which he requested the circuit court to make. We further note that counsel for the plaintiff acknowledges that the discharge summary was attached to MacNeal Hospital's motion for summary judgment as part of the decedent's hospital records. As a result of acknowledging receipt of the discharge summary some five months before trial, plaintiff has withdrawn his assertion that the document had been intentionally withheld.

However, plaintiff, nonetheless, argues that he was unfairly prejudiced by the circuit court's decision to allow the discharge summary to be introduced where MacNeal Hospital failed to disclose the document through discovery. Plaintiff maintains that he had little opportunity to explore questions regarding the document's preparation and to prepare for the adverse examination of Dr. Vollala about the document.

Admission at trial of evidence which should have been disclosed through discovery is not reversible error absent proof that it resulted in prejudice. *Leggett v. Kumar*, 212 Ill. App. 3d 255, 276 (1991). As the imposition of sanctions for failure to comply with discovery rules lies within the trial court's discretion, this court will not reverse the trial court's decision absent a clear abuse of discretion. *Cyclonaire Corp. v. ISG Riverdale, Inc.*, 378 Ill. App. 3d 554, 562 (2007).

In support of his argument that evidence of the discharge summary was highly prejudicial and warranted a new trial, plaintiff relies on *Ashpole v. Brunswick Bowling & Billiards Corp.*, 297 Ill. App. 3d 725 (1998). In *Ashpole*, a bowler who was injured after falling sued the owner and operator of the bowling alley. This court determined that

the operator of the bowling alley acted in bad faith where it failed to identify as a witness one of its employees who was the only defense witness who saw the plaintiff fall. As a result, this court held that the circuit court abused its discretion by allowing the undisclosed employee to testify as a witness and remanded the case for a new trial. *Ashpole*, 297 Ill. App. 3d at 728-30. *Ashpole* is distinguishable from the present case, which involves a discharge summary document rather than the failure to disclose a defendant's sole witness. Furthermore, unlike *Ashpole*, it is now undisputed that the failure to disclose the discharge summary was not purposeful.

■ Contrary to plaintiff's argument, we find that he has failed to show any substantial prejudice from the introduction of evidence relating to the discharge summary. The record shows that plaintiff was allowed to question Dr. Vollala regarding the creation of the discharge summary during the additional adverse examination. Plaintiff questioned Dr. Vollala's credibility where Dr. Vollala had previously testified that he did not recall creating a discharge summary in this case. This additional examination also allowed plaintiff to argue extensively during closing argument that Dr. Vollala's testimony could not be believed based on the answers that he gave to plaintiff's counsel. We note that it was plaintiff himself that used an enlargement of the discharge summary during closing arguments and introduced the document into evidence. Thus, the jury had the opportunity to consider the discharge summary as well as the testimony of Dr. Vollala regarding his lack of recollection in reviewing the discharge summary. Furthermore, the jury also had the opportunity to consider the discharge summary in light of the curative instruction that the circuit court gave immediately preceding plaintiff's adverse examination of Dr. Vollala regarding the discharge summary. See, *e.g.*, *Crumpton v. Walgreen Co.*, 375 Ill App. 3d 73, 84 (2007) (to the extent any prejudice occurred it was cured by the circuit court's instruction to the jury). Plaintiff has therefore failed to show how he was harmed by the late disclosure of the discharge summary.

Moreover, plaintiff has not presented any evidence that the discharge summary contained any information that was not also contained in the medical records that plaintiff already had in his possession. While plaintiff asserted during oral arguments before this court that the discharge summary omitted relevant information concerning the decedent's care, plaintiff was permitted the opportunity to question Dr. Vollala regarding any inconsistencies and raise these issues during closing arguments. Accordingly, we find no abuse of discretion in the circuit court's decision to allow evidence of the discharge summary.

## B. Board-Certification Examination

Plaintiff next contends that the circuit court abused its discretion by granting Dr. Vollala's motion *in limine* to bar plaintiff from introducing evidence that Dr. Vollala failed to obtain board certification in internal medicine where Dr. Vollala became an expert in his own case.

A trial court's ruling on a motion *in limine* addressing the admission of evidence will not be disturbed on review absent a clear abuse of discretion. *Ahmed v. Pickwick Place Owners' Ass'n*, 385 Ill. App. 3d 874, 891 (2008). An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would take the same view. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

Plaintiff argues that the circuit court incorrectly applied this court's decision in *Jones v. Rallos*, 373 Ill. App. 3d 439 (2006) (*Jones I*), *vacated & circuit court judgment affirmed upon reconsideration*, *Jones v. Rallos*, 384 Ill. App. 3d 73 (2008) (*Jones II*), to bar plaintiff from inquiring about Dr. Vollala's board certification and that a new trial is required.

In *Jones I*, this court held that evidence of a doctor's failure of his board examinations is not relevant unless that doctor testifies as an expert as to the medical standard of care. *Jones I*, 373 Ill. App. 3d at 447. This court found that the defendant testified as to her treatment of the plaintiff, but not as an expert at trial. Therefore, this court determined that it was reversible error to permit references to the defendant's board-certification status and remanded for a new trial. *Jones I*, 373 Ill. App. 3d at 447. The plaintiff filed a petition for leave to appeal. While our supreme court denied the petition for leave to appeal, the court entered an order directing this court to vacate its opinion and to "reconsider its judgment, with additional analysis of whether any error in the trial court's decision to permit plaintiff-appellee to elicit evidence of defendant-appellant's failure to pass board-certification examinations constitutes no more than harmless, nonreversible error." *Jones v. Rallos*, 225 Ill. 2d 636 (2007).

Pursuant to our supreme court's supervisory order, this court vacated its previous judgment and reconsidered the matter in *Jones II*, 384 Ill. App. 3d 73. In *Jones II*, this court reiterated its view that the defendant physician's testimony was similar to that provided by the defendant in *Rockwood v. Singh*, 258 Ill. App. 3d 555 (1993).

In *Rockwood*, the plaintiff argued that the trial court erred in barring her from making any reference to the defendant physician's failure to become a board-certified neurosurgeon. *Rockwood*, 258 Ill. App. 3d at 557. This court held:

"Generally, when a physician sued for malpractice testifies as an expert, evidence as to his age, practice, and like matters relating to his qualifications as an expert is admissible. [*McCray v. Shams*, 224 Ill. App. 3d 999 (1992).] In such cases, the failure to pass board certification examinations is relevant and admissible." *Rockwood*, 258 Ill. App. 3d at 557.

In *Rockwood*, this court determined that the defendant physician's testimony "was not used to show the standards of medical care *** but, rather, was used to relate to the jury what occurred before, during, and after the surgery. For these reasons, the circuit court correctly barred reference to defendant's board-certification status." *Rockwood*, 258 Ill. App. 3d at 558.

In *Jones II*, this court noted that the defendant provided testimony that was similar to the defendant physician in *Rockwood*. However, this court concluded that it could not say that the circuit court abused its discretion in denying the defendant's motion *in limine* to bar questions regarding defendant's failure to pass the board-certification examination. *Jones II*, 384 Ill. App. 3d at 90-91. In accordance with our supreme court's supervisory order, this court also concluded that even if the circuit court had erred in allowing the evidence regarding the defendant physician's failure to pass her board-certification examination, such error did not constitute reversible error. *Jones II*, 384 Ill. App. 3d at 91.

In *Jones II*, this court applied the well-settled principle that a trial court's ruling on a motion *in limine* addressing the admission of evidence will not be disturbed on review absent a clear abuse of discretion. *Jones II*, 384 Ill. App. 3d at 90, citing *Swick v. Liautaud*, 169 Ill. 2d 504, 521 (1996). Nothing in *Jones II* changed the law as set forth in *Rockwood* that when a physician sued for malpractice testifies as an expert, evidence including the failure to pass a board-certification examination is relevant and admissible. *Rockwood*, 258 Ill. App. 3d at 557.

Here, the record shows that Dr. Vollala's testimony was not used to show the standard of medical care associated with the treatment of aortic dissection but, rather, was used to relate to the jury what occurred prior to John's death. Plaintiff argues that Dr. Vollala provided expert testimony where he testified about the decedent's symptoms of retrosternal pain, unstable angina, chest pain, and the use of beta blockers, Demerol, and nitroglycerin. Contrary to plaintiff's assertion, we find that this testimony was provided within the context of the treatment decisions and medications that Dr. Vollala provided to the decedent. While Dr. Vollala provided general explanations of these various medical conditions of the heart, at no time did Dr. Vollala give

opinions as to the standard of care or any other opinions as an expert. The record also shows that the circuit court carefully considered the parties' arguments and the applicable case law in granting Dr. Vollala's motion *in limine* and subsequently denying plaintiff's motion for a new trial. We therefore cannot say that the circuit court abused its discretion in granting Dr. Vollala's motion *in limine* to bar evidence regarding his failure to pass the board-certification examination.

## C. Plaintiff's Claim of Substantial Error and Closeness of the Evidence

■ Plaintiff lastly contends that the circuit court erred in refusing to consider that where the facts of this case were close, any substantial error required a new trial.

Plaintiff correctly notes that "where the case is a close one on the facts, and the jury might have decided either way, any substantial error which might have tipped the scales in favor of the successful party calls for reversal." *Both v. Nelson*, 31 Ill. 2d 511, 514 (1964). However, not every alleged error requires a reversal. " ' "Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment or decree will not be disturbed." ' " *Simmons v. Garces*, 198 Ill. 2d 541, 566-67 (2002), quoting *Lawson v. G.D. Searle & Co.*, 64 Ill. 2d 543, 559 (1976), quoting *Both v. Nelson*, 31 Ill. 2d 511, 514 (1964). Plaintiff argues that substantial error occurred in the present case from the admission of the discharge summary and the circuit court's decision to bar evidence of Dr. Vollala's failure to pass the board-certification examination. However, as previously discussed, plaintiff failed to demonstrate that he was prejudiced by the admission of the discharge summary where he was granted all the relief requested and admitted the document into evidence as a plaintiff's exhibit. In addition, plaintiff failed to show that the circuit court abused its discretion in barring the evidence regarding Dr. Vollala's board-certification examination where Dr. Vollala did not present expert testimony in this case. Since we conclude that no error was demonstrated in this case, we find no basis to disturb the jury's verdict.

Moreover, we cannot say that the jury's verdict in favor of defendants was unreasonable, arbitrary, or unsupported by evidence such that a new trial is required. See *York*, 222 Ill. 2d at 179. As outlined above, defendants presented evidence including the testimony of several experts regarding the proper standard of care by which Drs. Vollala and Choi should be judged. The jury heard evidence that defendants did not breach the standard of care in treating the decedent and, as a result, did not proximately contribute to or cause his death.

Specifically, the medical witnesses agreed that an aortic dissection was a rare condition for a person of decedent's age and background and that the decedent exhibited no typical signs or symptoms relating to the condition. The jury also heard evidence that even if the rare condition had been diagnosed, there was no medical treatment that could have been rendered in time to have saved the decedent's life. While the jury also heard plaintiff's theories and plaintiff's experts' testimony that defendants breached the standard of care, the jury was free to weigh the evidence and judge the credibility of the witnesses presented. *Moore v. Anchor Organization for Health Maintenance*, 284 Ill. App. 3d 874, 880 (1996) ("it is the function of the jury to weigh contradictory evidence, judge the credibility of witnesses, and draw ultimate conclusions as to the facts of a case"). It was within the province of the jury, as finder of fact, to listen to the competing expert testimony, weigh the evidence presented, determine the credibility of all the witnesses, and determine whose testimony to accept or reject. *Bosco*, 388 Ill. App. 3d at 461. We therefore find that the circuit court did not abuse its discretion in denying plaintiff's motion for a new trial where the jury's verdict in favor of defendants was supported by the evidence. As previously discussed, plaintiff was not denied a fair trial based on his allegations of error and, thus, plaintiff was not entitled to a new trial.

For the above reasons, we affirm the circuit court's judgment.

Affirmed.

MURPHY, P.J., and COLEMAN, J., concur.